**SOUTHWEST TEXAS & INTERNATIONAL FLYING CLUB, INC., et al., Appellants,**

v.

**CITY OF DEL RIO et al., Appellees.**

No. 13445.

Court of Civil Appeals of Texas.

San Antonio.

April 8, 1958.

Rehearing Denied May 6, 1959.

Holman, Graves & Saccomanno, Houston, for appellants.

Montague & Thurmond, Scofield & Burford, Del Rio, O'Quinn, McDaniel & Randle, Trueman O'Quinn, Austin, for appellees.

W. O. MURRAY, Chief Justice.

This suit was instituted by Southwest Texas & International Flying Club, Inc., hereinafter called Flying Club, and F. L. McMichael, against the City of Del Rio, hereinafter called city, and Hamilton White, seeking in trespass to try title to recover a leasehold estate in .086 of an acre of land out of Survey 2, Block 4, I. G. N. R. R. Co., lands in Val Verde County, Texas, and in the alternative, for rent, damages, and injunctive relief.

The trial was to a jury, and the jury's answers to the issues submitted were generally favorable to the plaintiffs, but the trial court rendered judgment non obstante veredicto that plaintiffs take nothing, from which judgment the Flying Club and F. L. McMichael have prosecuted this appeal.

The controlling question in this case is the interpretation and construction of the provisions of a written lease contract between the city and the Flying Club, entered into on March 25, 1952, relating to the operation and management of the Municipal Airport of the City of Del Rio. The contract reads as follows:

"State of Texas }
"County of Val Verde }

"Whereas, the City of Del Rio, a municipal corporation, is the owner of an airport located West of the City limits, commonly known and referred to as the 'Municipal Airport'; and

"Whereas, it is desired by the City that its said airport be preserved and kept in condition for use at all times for any needed military or civilian use, now, or hereafter as may be required; and

"Whereas, to this end it has entered into an agreement with the Southwest Texas and International Flying Club, Incorporated, to operate said airport under the following terms and conditions and for the time set out.

"It is, therefore, mutually agreed by and between the City of Del Rio, acting by and through its Mayor, duly authorized by the City Commission, hereinafter referred to as party of the first part, and Southwest Texas and International Flying Club, Inc., a private corporation whose domicile and principal place of business is Del Rio, Val Verde County, Texas, acting by and through its officers hereunto duly authorized, hereinafter referred to as party of the second part, as follows, to-wit:

"1. This contract and agreement shall remain in full force and effect for a period of sixteen years, beginning March 20, 1952, and terminating on March 19, 1968, subject, however, to the following qualifications, to-wit:

"(a) In the event of an emergency or in case of war, and the armed forces should require the use and control of the airport covered by this agreement, then in such event on notice to party of the second part by party of the first part of the necessity existing for the use of said airport by the armed forces, or for public use in

such an emergency, then party of the second part, shall forthwith deliver possession of said airport to party of the first part, or its designated nominee, and during the duration of the emergency, or the war, as the case may be, the provisions of this contract shall be suspended, but upon the termination of such emergency, or the war, as the case may be, then the party of the second part shall have the right to resume the operation and control of said airport under this contract, and all its terms and conditions shall then reapply and become effective, or

"(b)   In the event party of the first part should rebuild the entire airport involving a Government loan, the terms of which should require that the City of Del Rio, or party of the first part, should resume operation and control of said airport or that such rebuilding itself should require the actual operation and control by party of the first part, then in such event, upon proper notice of its intention to so rebuild to party of the second part, party of the second part shall forthwith deliver possession of said airport to party of the first part, it being agreed, however, that after such reconstruction or rebuilding of said airport, if same should be done, and the party of the first part then elects to lease said airport and all facilities thereon, in such event the party of the second part shall have a first and prior option to lease said airport upon such terms and conditions as any other person, natural or artificial, shall offer to lease same, the city, or party of the first part, being agreeable to such lease and all terms thereof.

"2.   The consideration for the leasing and letting of said airport and facilities thereon or therein by party of the first part to party of the second part shall be the sum of One ($1.00) Dollar, per year, to be paid party of the first part by party of the second part; the first such payment to be due and payable on March 20, 1952, and a like payment in the sum of One Dollar to be due and payable on or before the 20th day of March of each succeeding year during the term of this contract.

"3.   Party of the second part agrees that in the operation of said airport it will maintain or cause to be maintained services commonly furnished at an airport for the services and accommodation of airplanes on a twelve hour basis, and to provide a line boy at its own cost and expense on a twelve hour basis to assist with the handling of aircraft landing or taking off from said field.

"4.   Party of the second part further agrees to pay all utility bills incurred by said airport during the term hereof, including telephone, except water furnished said airport for domestic or other purposes, which water is to be furnished by party of the first part, free of cost to party of second part.

"5.   As a condition of this contract, party of the second part agrees to keep and maintain said airport and hangar area in a sanitary condition and to maintain said airport and landing strips and taxi ways at its own expense in accordance with the standards of Civil Aeronautics Authorities for a Class I airport.

"6.   As a further consideration for this contract, second party agrees to keep up the airport, both field and hangar and toilet facilities in a sanitary condition at all times at their own expense, and that the party of the first part shall not in any way be called upon for such. Should any Government Inspector find the field or hangars in an unsafe condition for flying at any time, then second party shall remedy and repair and keep up the same in accordance with the instructions from said Government Agent and will at all times keep the peace and conduct the said field and said airplane business in an orderly and moral manner and see that the same is so conducted at all times, and shall do whatever, within its capacity or authority is necessary to prevent vandalism and/or sabotage.

"7. Party of the second part shall have the exclusive right and privilege either for itself, or under its direction, to make reasonable charges for services or hangar fees, and for the operation or conducting of all other concessions or services as to second party may seem necessary or proper to more efficiently operate said airport, or to provide for the public convenience thereon, as well as for services for an A and E aircraft mechanic, which mechanic is to be employed by party of the second part, and shall have the privilege of selling gasoline and airplane lubricants at retail prices, and shall further be afforded the right and privilege of teaching flying or conducting an air school for civilians at said airport and shall retain as its own such fees, profits and revenues, which shall be used for the furtherance of the project and not for profit of second party. In this connection, if flying lessons are offered, or an air school conducted under sub-contract, or direction of party of the second part, then party of the second part is to indemnify such students for all sums of money paid for such instructions in advance, and shall provide the instruction or lessons for which they had paid in advance, or refund the money so paid in advance if lessons or instructions are terminated. It is further agreed that all charges made by party of the second part for hangar fees, services for the use of airport facilities, shall at all times be subject to approval of party of the first part.

"8. It is further agreed and understood that party of the second part shall be authorized and empowered to sub-contract under such terms and conditions as it may elect, any of the privileges afforded it hereunder, but such contracts shall in no manner affect or impair the obligation of party of the second part nor diminish any of the rights of party of the first part hereunder; it being understood that the party of the second part, at its option, may employ flying instructors, conduct any air school under sub-contract, etc., as it may elect, and in the event such is done party of the second part

shall have authority to contract with such person or persons as it may elect covering any of the matters covered by this contract, but at all times subject hereto.

"9. It is further agreed and understood by and between the parties hereto and as a condition of this contract that said airport shall always be deemed a public facility and nothing herein shall be construed as granting a franchise or exclusive agency to party of the second part and the final control and management of said airport shall at all times be reserved to and reposed in the party of the first part.

"10. It is understood and agreed that this contract shall supersede and take the place of a contract heretofore executed by the parties hereto, dated March 20, 1948, and terminating March 19, 1958.

"In Testimony Whereof, these presents are signed this 25th day of March, A.D., 1952."

The .086 of an acre of land sued for is a part of the city's Municipal Airport. The Flying Club assigned its contract with the city to F. L. McMichael. The city, thereafter, on February 27, 1956, leased the .086 of an acre of land to Hamilton White, and it is the contention of appellants that the city had no authority to execute that lease because it had theretofore given to appellants the exclusive right to operate the city's Municipal Airport.

The two paragraphs of the March 25, 1952, contract calling for interpretation and construction here are numbers 7 and 9. Appellants contend that under the terms of paragraph 7 they had the exclusive right to operate and control the Airport, while appellees contend that under the provisions of paragraph 9, the city retained the ultimate and final right to control and manage the Airport, and that under this right it had the authority and power to execute the lease dated February 27, 1956, of the .086 acre of land to White.

There is an apparent conflict between the provisions of paragraphs 7 and 9, and it is

this apparent conflict that concerns us here. In paragraph 7 it is provided, among other things, that "Party of the second part (Flying Club) shall have the exclusive right and privilege, etc.," while in paragraph 9 it is provided, among other things, "that said airport shall always be deemed a public facility and nothing herein shall be construed as granting a franchise or exclusive agency to party of the second part and the final control and management of said airport shall at all times be reserved to and reposed in the party of the first part."

There was no extraneous evidence introduced bearing on the intention of the parties in executing the contract. The all-important thing to be determined in construing a contract is to arrive at the intention of the parties. Here the intention of the parties will have to be arrived at from the four corners of the contract. In doing so, it is our duty to reconcile, if reasonably possible, the apparent conflict in the contract and give meaning to each part of the contract. The only way this can be accomplished is to construe the contract to the effect that paragraph 7 is limited by paragraph 9. In other words, appellants were given certain exclusive rights and privileges, as provided in paragraph 7, subject to the rights of the city set forth in paragraph 9. When this interpretation is given to the contract it becomes apparent that the city was authorized to enter into the contract it did, with Hamilton White on February 27, 1956. Appellants contend that the city acted improvidently in entering into that contract. This is something that we cannot pass upon. We can go no further than to determine whether the city had the power to make the contract, and we find that it did have such power. Wussow v. Gaida, 251 Wis. 328, 29 N.W.2d 42. The contract here involved is subject to the construction set out in Galveston Wharf Co. v. Gulf, C. & S. F. Ry. Co., 81 Tex. 494, 17 S.W. 57, 59, wherein the Court quoted with approval from Proprietors of Passaic and Hacken-

sack River Bridges v. Hoboken Land & Improvement Co., 13 N.J.Eq. 81, as follows:

"Public grants are to be strictly construed. Contrary to the rule adopted in the case of private contracts, they are to be taken more strongly against the grantee, and in favor of the public. If there be a doubt as to the extent of the grant, the doubt is resolved in favor of the public."

The same rule of construction is set forth in 23 Am.Jur., Franchises, § 16, p. 725, in these words:

"While it is the accepted doctrine that all grants are to be construed according to the intention of the parties, yet there are certain general rules of construction by the light of which such contracts are to be examined. These rules are well settled by numerous authorities. One is that in all grants by the government to individuals or corporations, of rights, privileges, and franchises, the words are to be taken most strongly against the grantee, contrary to the rule applicable to the grant from one individual to another."

If it is not clear from the reading of the entire contract that the city intended to convey an exclusive grant to the Flying Club, then the grant will be construed as being a non-exclusive one. Incorporated Town of Hempstead v. Gulf States Utilities Co., 146 Tex. 250, 206 S.W.2d 227; City of Memphis v. Browder, Tex.Com.App., 12 S.W.2d 160; Fink v. City of Clarendon, Tex.Civ.App., 282 S.W. 912.

Appellants contend that the city and White are estopped to deny that they have an exclusive agreement to operate the Airport. We overrule this contention. We have heretofore held that the contract did not give appellants an exclusive right to operate the Airport as against the city, and that the ultimate control and management of the Airport was reposed in the city. The fact that the city did not find it necessary

to assert this final control for some four years does not estop it from doing so when it sees fit to do so. Appellants' other points are without merit and are overruled.

The judgment is affirmed.